UNITED STATES SMELTING REFINING & MINING CO. v. LOWE.

FIRST NAT. BANK OF FAIRBANKS, ALASKA, et al. v. SAME.

Nos. 5493, 5494.

District Court for the Territory of Alaska, Fourth Judicial Division.

Dec. 18, 1947.

See, also, 66 F.Supp. 897.

Southall R. Pfund, and Charles J. Clasby, both of Fairbanks, Alaska, for plaintiffs.

Bailey E. Bell, of Fairbanks, Alaska, for defendant.

PRATT, District Judge.

This is a suit to quiet title in support of an adverse filed in the Land Office against defendant Lowe's application for patents.

The plaintiffs allege ownership of the "L Association" and "Snow Shoe Fraction", placer mining claims, by virtue of locations thereof in 1908. The defendant claims the ground in controversy by locations made in 1941, upon the theory (a) that the location certificates of plaintiffs' predecessors were insufficient; and (b) that the annual labor was not done as required by law.

The case was in the nature of a suit in equity, triable before the Judge, alone, but an advisory jury was impaneled. It found in favor of the plaintiffs, and against the defendant.

The legal phases of the case have been submitted to the Court upon briefs filed by counsel for the parties.

I. 1. Defendant alleges that the location certificates for said claims did not describe them with reference to any natural object or permanent monument, and that therefore the ground was open to location.

Section 26, Title 1, Chapter 1 of the Act of Congress making further provision for the government of Alaska, approved June 6, 1900, 31 Stat. 329, Section 321, Compiled Laws of Alaska 1933, Section 381, Title 48 U.S.C.A., provides: "The laws of the United States relating to mining claims, mineral locations, and rights incident thereto are hereby extended to Alaska: Provided * * *." Thus said Section 26 adopted the provisions of Section 2324, R.S.U.S., 30 U.S.C.A. § 28, to the same extent as if said Act had been written into Section 26 fully. 59 C.J. 1059.

Section 15 of said Act of June 6, 1900, 31 Stat. 327, 48 U.S.C.A. § 382, in providing for the instruments which the recorders should receive for record, stated: " * * * Notices of location of mining claims shall be filed for record within ninety days from the date of the discovery of the claim described in the notice, * * *".

Said Section 2324, R.S.U.S., and said Section 15, above described, were held to permit but not require the filing of a location certificate. It was further held that the filing of an insufficient certificate did not make the ground open for location. Sturtevant v. Vogel, 9 Cir., 1909, 167 F. 448; U. S. Smelting Refining & Mining Co. v. Lowe, D.C., 66 F.Supp. 897.

■ Although Territorial laws as to filing location certificates were passed by the legislature in 1913 and thereafter, they applied only to mining claims located thereafter, and have no effect upon claims located before 1913.

Consequently, it is immaterial whether the location certificates above mentioned were sufficient or not.

II. Both plaintiffs and defendant alleged in the pleadings actual possession and ownership of the ground in controversy. The pleadings of both parties likewise pray for affirmative relief, to-wit, that their title be quieted, and that they be adjudged the owners of the ground mentioned.

■ Nevertheless, the defendant maintains that plaintiffs cannot make out a case without showing actual possession of the ground in controversy at the time of the commencement of the suit.

It is believed that defendant has waived any right to raise such point by reason of having submitted herself to the jurisdiction of the Court in praying for affirmative relief. Pioneer Mining Co. v. Pacific Coal Co., 4 Alaska 463; O'Hara v. Parker, 27 Or. 156, 39 P. 1004; State v. Blize, 37 Or. 404, 61 P. 735; Mascall v. Murray, 76 Or. 637, 149 P. 517; Square Deal Mining Co. v. Colomon Mining Co., 61 Colo. 93, 156 P. 147; Sanders v. Village of Riverside, 7 Cir., 118 F. 720.

III. a. As used hereinafter:

"C.L.A." shall mean Compiled Laws of Alaska, 1933;

"Annual Labor" shall be deemed to mean improvement for the benefit of a mining claim to the extent of $100, or mining work upon the claim in the same value, or mining work and improvements of the value of $100 in a designated annual labor year.

b. Section 2324, R.S.U.S., as a part of said Section 26 of the Alaska Act, provided in effect:

(1) That failure to perform the annual labor upon a mining claim did not render it open to relocation unless the owner failed to resume work upon the claim after such failure and before relocation thereof;

(2) That the owner of a validly located mining claim was presumed to have done the annual labor and the burden of proving the contrary was upon any person asserting the same. Lindley on Mines, 3d Ed., page 1583, note 29; Morrison's Mining Rights, 16th Ed., page 130; 40 C.J. 845.

c. In the Act of Congress, approved March 2, 1907, hereinafter called the Waskey Act, entitled "An Act To amend the laws governing labor or improvements upon mining claims in Alaska", 34 Stat. 1243, T. 48, § 384, U.S.C.A.; Sec. 162, Compiled Laws of Alaska 1913, the Section being erroneously dropped from the 1933 C.L.A., appears in effect the following provisions:

(1) That if there was a failure to do the annual labor required by law upon a mining claim, a forfeiture ensued and the right of the owner to resume work after such failure was abolished.

(2) That if an affidavit of annual labor was not filed within 90 days after the close of the annual labor year, the burden of

proof was upon the "claimant to establish the performance of such annual work and improvements".

▮ D. The Waskey Act, therefore, repealed by implication (as it had no repealing clause in it) the conflicting parts of Section 2324, R.S.U.S., as a part of the laws of Alaska, and as mentioned above in sub-paragraphs C(1) and (2). Thatcher v. Brown, 9 Cir. 1911, 190 F. 708; Ebner Gold Mining Co. v. Alaska-Juneau Gold Mining Co., 9 Cir., 1914, 210 F. 599.

E. The defendant asserts that when an affidavit of annual labor is required by law, the Waskey Act provides, in effect, that failure to file an affidavit of annual labor is prima facie evidence that the annual labor was not done upon the claim.

For the purpose of treating the subject, it will be temporarily, only, assumed that such was the effect of the Waskey Act.

Section 2324, R.S.U.S., as a part of Section 26 of the Alaska law, and as amended by the Waskey Act, continued in that state until the amending Act of May 31, 1938, 52 Stat. 588, Title 48 U.S.C.A. § 381, entitled "An act to amend section 26, title 1, chapter 1, of the Act entitled 'An Act making further provision for a civil government for Alaska, and for other purposes,' approved June 6, 1900." This Act stated that said Section 26 was amended "to read as follows: 'Section 26. The laws of the United States relating to mining claims, mineral locations, and rights incident thereto are hereby extended to the Territory of Alaska: * * *'". Then follows some changes as to mining on and below tide water lands.

The 1938 amendment does not refer to the Waskey Act in any respect, nor does it include any of the provisions of the Waskey Act.

F. The plaintiffs assert that if the Waskey Act repealed by implication the right given by Section 2324, R.S.U.S., to resume work after failure to do annual labor and for the owner of a claim to have the presumption that annual labor was done, the Act of 1938 making the laws of the United States, to-wit, Section 2324, R.S.U.S., a part of the laws of Alaska without mentioning or including the provisions of the Waskey

Act, repealed that Act by implication. The defendant maintains that the following rule of interpretation governs and that the Waskey Act remains in full force and effect. Said rule is as follows, as set forth in 50 Amer. Juris., page 558, Section 553: "A later law which is merely a reenactment of a former law does not repeal an intermediate act which has qualified or limited the first one, but the intermediate act will be deemed to remain in force and to qualify or modify the new act in the same manner as it did the first. * * * These rules are, however, mere canons of construction, or aids to the ascertainment of the legislative intent, and must yield to such intent."

The rule just set forth in the first sentence will hereinafter be called "the intermediate amendment rule".

Of course, said rule was announced by courts in the light of the facts of the case before them and of the constitution and laws governing.

An examination of the cases which establish the rule will show the following:

(a) That there was a constitutional provision requiring that no law should be amended by reference to the title, only, but that the law should be re-enacted and inserted at length in the new act. Sec. 230, Lewis' Sutherland Statutory Construction, 2d Ed.

(b) The new law should embrace no more than one subject, which should be expressed in the title. Sec. 109, Id.

The part these constitutional provisions played in making said intermediate amendment rule is reflected in the cases on the subject. As Congress never had such limitations upon it, the rule cannot be of assistance in interpreting the intention of Congress as to an Act.

In State v. Clausen, 116 Wash. 432, 199 P. 752, 754, the Court said: "In construing the amendment of 1919 it is manifest that the use or repetition therein of language found in the original act, including that relating to the basis of the valuation of property of the district upon which the 5 per cent. limit of indebtedness should be computed, which in no way interfered with the revisions and extensions the Legislature desired and intended to accomplish by the

amendment, was but a vehicle or means mandatorily required by the Constitution."

Quoted cases in this decision show that such was the situation also in the states of Michigan, New Jersey and Oregon.

Illinois also had a similar constitutional restriction. People v. Lloyd, 304 Ill. 23, 136 N.E. 505.

In Eddy v. Kincaid, 28 Or. 537, 41 P. 136, rehearing page 655, which is cited as announcing said intermediate amendment rule, we find that although the Court, in the first hearing, stated the second amendment was not new matter and therefore did not amend the intermediate act, the basis of the opinion on rehearing was that the intention of the Legislature was not to repeal the intermediate act, this intention being shown by the title of the third act, and by the enumeration of the offices that were to be filled at the election (said enumeration not including railroad commissioners).

In Allison v. Hatton, 46 Or. 370, 80 P. 101, also cited as establishing the intermediate amendment rule, we again find the case being decided upon the intention of the Legislature, ascertained from the title of the act, and the fact that no provision was in it for making abstracts of title, from the records of the county which was allegedly losing the land, and filing them in the recorder's office of the county, which was allegedly receiving the strip of land.

While a few of the Oregon cases adhered to the intermediate amendment rule, the Supreme Court of Oregon definitely refused to follow the rule in the case of State ex rel. Brady v. Lightner, 1915, 77 Or. 587, 152 P. 232, 233.

Chapter 127, General Laws of Oregon 1915, in Sec. 1 thereof, amended Section 6313, L.O.L., as amended in 1913. The amendment consisted in adding a proviso that each incorporated city or town should constitute a separate road district.

Chapter 194, General Laws of Oregon 1915, again amended Section 6313, as amended by the laws of 1913. This amendment consisted in leaving off the proviso which was put on by Chapter 127 aforesaid, and by changing the October term to the September term. With the exception of changing October to September, it was a copy of the law as it existed prior to said Chapter 127.

Thus the situation was entirely covered by the intermediate amendment rule.

The Court held: "Chapter 127, the first act, purporting to amend section 6313, is superseded by the second act as far as there is any difference, because the Constitution requires that the act revised or section amended shall be set forth at length in the amendatory act. If there is anything to be added to section 6313 as set forth in the last amendatory act, the Constitution is thereby violated. * * * Amendment of an act or section by setting it out in full 'so as to read as follows' operates as an entire obliteration of the former act after the new one goes into effect." Citing, among other cases, "Columbia Wire Co. v. Boyce, [7 Cir., 104 F. 172]; Heinze v. Butte, [9 Civ., 107 F. 165]." It further stated: "It is settled by the great weight of authority that the act amended, being the last expression of the Legislature, is the law. * * *"

This case involves the same situation which confronts us in the present case, and it, in effect, overrules all prior Oregon cases to the contrary.

In Re Ferguson's Estate, 325 Pa. 34, 189 A. 289, at page 292, the Court said: "If such radical departure from legislative policy had been intended by the Fiscal Code, it would have been clearly indicated in the title as required by article 3, section 3, of the Constitution".

Illinois: Smith-Hurd Rev.Stat. 1931, Chap. 131, Sec. 2, provides that any provisions of any statute, so far as they are the same as those of any prior statute, shall be construed as a continuation of such prior provisions, and not as a new enactment. City of Altamont v. Baltimore and Ohio R. Co., 1932, 348 Ill. 339, 180 N.E. 809. Thus the statute of Illinois compels its courts to interpret a statute in the same manner as the interpretation declared by the intermediate amendment rule.

■ IV. The rule is subject to the exception that where the re-enacting act and the intermediate act are wholly inconsistent with each other and cannot stand together, the intermediate act will be regarded as repealed.

In Gaston v. Merriam, 33 Minn. 271, 22 N.W. 614, 621, the intermediate amendment rule is set forth, and the court then says: "If, then, section 37, c. 6, Laws 1877, operated to modify * * * the provisions of the law of 1874, regarding the time of redemption, it must be deemed as continuing in force to modify or qualify the same provisions re-enacted in the Law of 1878 unless, (1) the act of 1878 covers the entire subject covered by section 37, and was plainly intended as a substitute for it, and to furnish the only rules on the subject; or (2) that the provisions of the two acts are so irreconcilably inconsistent that they cannot stand together." To the same effect are Board of Education v. Tyler County Court, 77 W.Va. 523, 87 S.E. 870; Buchsbaum & Co. v. Gordon, 389 Ill. 493, 59 N.E.2d 832; State ex rel. Brady v. Lightner, 77 Or. 587, 152 P. 232.

In Hawes v. Fliegler, 87 Minn. 319, 92 N.W. 223, with reference to plaintiff's insistence that the rule of construction (intermediate amendment rule) governed the case, the Court said, at page 224 of 92 N.W.: "Both acts, however, remain as they are on the statute books, but the former in time of enactment repeals the later, under the plaintiff's application of the strict, technical rules of interpretation. Meanwhile the citizen is inexorably held to the letter of the intermediate act, * * *. But canons of construction are not arbitrary or infallible, and should not be permitted to prevail against reason and justice in construing inharmonious legislative enactments * * * 'Canons of construction are not the masters of the courts, but merely their servants.'"

The court held that the third act repealed the intermediate amendment, though it re-enacted the first act without mentioning the intermediate one.

In Re Metcalf's Estate, 319 Pa. 28, 179 A. 587, 588, the court said that the appellant, in relying on the rule (intermediate amendment rule) "ignores the exception to the rule that, 'where the re-enacting act and the intermediate act are wholly inconsistent with each other and cannot stand together, the intermediate act will be regarded as repealed.'"

The holding of the Pennsylvania courts that a subsequent amendment which was inconsistent with an intermediate amendment would repeal the intermediate amendment to the extent of the inconsistency, was approved by the Pennsylvania Legislature by the Act of May 28, 1937, P.L. 1019, Article V, Section 75, 46 P.S. § 575, providing "whenever two or more amendments [are made], if the amendments be irreconcilable, the latest in date * * * shall prevail."

In State v. Klasen, 123 Minn. 382, 143 N.W. 984, 985, 49 L.R.A., N.S., 597, the court stated, with reference to the intermediate amendment rule: "It may be conceded that chapter 43 is an intermediate act within the rule, * * *. The principle stated, however, is a mere canon of construction, or aid to the ascertainment of legislative intent, and must yield to the latter. * * * Laws are presumed to have been passed with deliberation, and with full knowledge of all existing ones on the same subject. * * * we reach the conclusion that the provisions of the two acts are so irreconcilably inconsistent that they cannot stand together, * * *".

The last amendment was held to be controlling. To the same effect is the case of Klemme v. Drainage Dist., 380 Ill. 221, 43 N.E.2d 966–968.

V. Construction of acts of Congress never were aided by the intermediate amendment rule.

When it passed the 1938 Act, Congress is presumed to have known the law upon the subject, to-wit, Sec. 2324, R.S. U.S., as a part of Sec. 26 of the Alaska law, as amended by the Waskey Act. 50 Amer.Juris. 331; Sullivan v. Ward, 304 Mass. 614, 24 N.E.2d 672, 130 A.L.R. 437; State v. Klasen, 123 Minn. 382, 143 N.W. 984, 985.

In Continental Ins. Co. v. Simpson, 4 Cir., 8 F.2d 439, at page 442, the court says: "The Legislature is presumed to legislate with knowledge of former related statutes * * *." In "The Penza", 2 Cir., 9 F.2d 527, 528, it was held: "It is always assumed that statutes are passed in light of, and with reference to preexisting law * * *."

If, in 1938, Congress had intended to amend only the portion of said Section 26 of the Alaska law which referred to mining on beaches, it could have expressed that intention very simply, not being required by the constitution or statute to repeat the wording of the statute on the other subject.

■ Congress having, in plain unambiguous words stated in the 1938 Act that the laws of the United States relative to mining claims and rights incident thereto, should be in force in Alaska, there is no room for construction.

United States v. Missouri Pac. Railroad Co., 278 U.S. 269, 277, 49 S.Ct. 133, 136, 73 L.Ed. 322, where the court said: "It is elementary that, where no ambiguity exists, there is no room for construction. * * * Construction may not be substituted for legislation." The same rule is in Commissioner of Immigration v. Gottlieb, 265 U.S. 310, 44 S.Ct. 528, 68 L.Ed. 1931.

Having, in 1900, by Section 26 of the Alaska Act, placed the laws of the United States in operation in Alaska as to mining claims and rights incident thereto, and having found that wording successful in carrying out its intent, there was no reason for Congress to change that wording in 1938 when it intended to do the same thing. There is no reason why Congress should abandon any phrases merely because they have been used before, there being no law governing Congress which makes it necessary or expedient so to do.

In Wilbur v. U. S., 58 App.D.C. 347, 30 F.2d 871, at page 872, the court says: "Rules of statutory construction are never used to create, but only to remove, a doubt." In Crooks v. Harrelson, 282 U.S. 55, at page 59, 51 S.Ct. 49 at page 50, 75 L.Ed. 156, the court said: "It is urged, however, that, if the literal meaning of the statute be as indicated above, that meaning should be rejected as leading to absurd results, and a construction adopted in harmony with what is thought to be the spirit and purpose of the act in order to give effect to the intent of Congress. The principle sought to be applied is that followed by this court in Holy Trinity Church v. United States, 143 U.S. 457, 12 S.Ct. 511, 36 L.Ed. 226; but a consideration of what

is there said will disclose that the principle is to be applied to override the literal terms of a statute only under rare and exceptional circumstances. The illustrative cases cited in the opinion demonstrate that, to justify a departure from the letter of the law upon that ground, the absurdity must be so gross as to shock the general moral or common sense. * * * And there must be something to make plain the intent of Congress that the letter of the statute is not to prevail. Treat v. White, 181 U.S. 264, 268, 21 S.Ct. 611, 45 L.Ed. 853."

In Northern Pac. Railway v. Concannon, 239 U.S. 382, at page 385, 36 S.Ct. 156, at page 157, 60 L.Ed. 342, the court says: " * * * this interpretation of the act is inconsistent with its text * * *. We say it is inconsistent with its text, because in express terms the validating power * * * was made applicable only to 'all conveyances heretofore made,' and nothing in the context lends itself to the conclusion that Congress contemplated conferring on the Railway Company unlimited power * * *."

"The court cannot attribute to the Legislature an intent which is not in any way expressed in the statute." 59 C.J. 958.

■ Resort cannot be had to the legislative history of an act unless the statute is ambiguous. 50 Amer.Juris 321, Sec. 328.

"It is urged that the statute is highly penal in character and should therefore be construed strictly. But the object of all construction, whether of penal or other statutes, is to ascertain the legislative intent; and in penal statutes, as in those of a different character, 'if the language be clear it is conclusive.' " Osaka Shosen Kaisha Line v. U. S., 300 U.S. 98, 101, 57 S.Ct. 356, 358, 81 L.Ed. 532.

■ The fact that the Act of 1938 purports only to amend Section 26 of the Alaska Act of 1900 and does not mention the amendment thereof, is immaterial as the reference to the original act means that act, as amended, up to the date of the reference. State ex rel. Brady v. Lightner, 77 Or. 587, 152 P. 232, 233; Whitfield v. Davies, 78 Wash. 256, 138 P. 883, 884; Duke v. Amer. Casualty Ins. Co., 130 Wash. 210, 226 P. 501; Fletcher v. Prather, 102 Cal. 413, 36 P. 658; West & Co. v. Board

of Com., 14 Idaho 353, 94 P. 445; Yakima Amusement Co. v. Yakima County, 192 Wash. 179, 73 P.2d 519; State ex rel. City of Omaha v. Board of Com., 109 Neb. 35, 189 N.W. 639; 59 C.J. 831, Sec. 464; also page 883, Sec. 472.

VI. The intermediate amendment rule has never been the rule of construction of acts of Congress or state laws where not required by a Constitution or statute.

In Heinze v. Butte & B. Consol. Min. Co., 9 Cir., 107 F. 165, it was held as set forth in the syllabus: "The act of June 6, 1900 [28 U.S.C.A. § 227], providing that section 7 of the act of 1891, relating to the jurisdiction of the circuit court of appeals as to injunction cases, should be amended to read as therein prescribed, is valid notwithstanding it purports to amend a section of the act which had already been amended by the act of February 18, 1895, to which it did not refer, and its enactment necessarily operates to repeal the latter amendment." To the same effect are: Columbia Wire Co. v. Boyce, 7 Cir., 104 F. 172; Whitfield v. Davies, 78 Wash. 256, 138 P. 883; Rouw Co. v. Crivella, 8 Cir., 105 F.2d 434, 436; Koprivica v. Sather, 10 Alaska 593. In Re Lent, D.C., 34 F.Supp. 700, the court stated, page 705: "This is legislative reaffirmation of what was originally said in 1918, in the face of Act 145 of 1934. The implied amendment of the act of 1918 by Act 145 of 1934 is, therefore, nullified."

In Continental Ins. Co. v. Simpson, 4 Cir., 8 F.2d 439, at page 442, the court says: "But in both the Legislature first amended the original statute and then at a different time again amended and re-enacted it, omitting the first amendment. The rule is well established, and the reason for it plain, that the first amendment of a statute is repealed when the statute referred to is again amended and wholly re-enacted with the omission of the first amendment."

In Vansant Kitchen & Co. v. Commonwealth, 108 Va. 135, 60 S.E. 753, the Court said: "We think it plain that the second amendment operated as a repeal of the first amendment * * *. 'The repeal of a statute by implication is not favored by the courts * * *. To justify the presumption of an intention to repeal one statute by another, the two statutes must be irrecon-

cilable. * * * But where the latter statute was plainly intended to embrace the whole legislation on the subject to which it refers, and to be wholly substituted for all former statutes on the same subject, it must be held to be a legislative declaration that whatever is embraced in it shall prevail, and whatever is excluded is discarded and repealed.'"

In Western Assur. Co. v. Stone, 145 Va. 776, 134 S.E. 710, 48 A.L.R. 1009, the court approves the "reasons and authorities" of the court in the case of Vansant Kitchen & Co. v. Commonwealth, supra.

In 1900, when the laws of the United States relative to mining claims and rights incident thereto were adopted for Alaska by Section 26 of the Alaska Act, such adopted laws were complete legislation upon that subject. Therefore, when the Act of 1938 again put the laws of the United States forward as the laws governing Alaska with reference to mining claims and rights incident thereto, that act embraced the whole legislation upon the subject and was to be wholly substituted for any former statutes.

VII. From the foregoing, it appears that the Act of 1938 repealed the Waskey Act in so far as it provided:

(a) For the abolishment of the right to resume labor upon a mining claim after failure to do the annual labor thereon;

(b) That failure to file the annual labor affidavit should throw the burden on the *claimant* to prove the doing of the annual labor.

VIII. The Waskey Act did not make the failure to file an affidavit of annual labor prima facie evidence that the annual labor was not done.

The wording of the Waskey Act upon the above subject is: "Such affidavit shall be prima facie evidence of the performance of such work or making of such improvements, but if such affidavit be not filed within the time fixed by this Act, the burden of proof shall be upon the *claimant* to establish the performance of such annual work and improvements and upon failure of the locator or owner of any such claim to comply with the provisions of this Act, as to performance of work and improve-

ments, such claim shall become forfeited and open to location by others as if no location of the same had ever been made."

Inasmuch as the law makers had just used the words "prima facie evidence" as to the effect of filing an affidavit of annual labor, it would have been natural for them to have used the same words if they intended to state the converse, to-wit, that the failure to file such an affidavit should be prima facie evidence that the annual labor was not done.

Attention is called to the use of the word *"claimant"*, in describing one upon whom the burden of proof was to be placed if there was a failure to file an affidavit of annual labor. *That is a word which is* seldom used with reference to a party to a suit in court. An examination of the Land Office rules with reference to the procedure for getting patents to mining claims shows that in the first 108 regulations the word *"claimant"* is used 32 times to describe the applicant for a patent.

■■■ As the statutory rule of construction is that words are to be given their common meaning unless the statute shows they were used with some other meaning, the word *"claimant"* in the Waskey Act should be presumed to refer to the applicant for patent in the Land Office.

The fact that a later act of Congress amending the mining laws also has one section which relates entirely to Land Office matters, to-wit, patenting a mining claim, lends some weight to the above-mentioned interpretation.

The Act of Congress approved August 1, 1912, 37 Stat. 243, 48 U.S.C.A. § 390, Sec. 351, C.L.A., and being entitled: "An Act To modify and amend the mining laws in their application to the Territory of Alaska, and for other purposes", in the next to the last section thereof, provides: "Sec. 4. That no placer-mining claim hereafter located in Alaska shall be patented which shall contain a greater area than is fixed by law, nor which is longer than three times its greatest width."

■■■ But even if the word *"claimant"* be interpreted to mean a party in court affirmatively claiming that the annual labor was one upon his claim, the Waskey Act would not place the burden of proof upon the plaintiffs in this case, because they never got to the point where they were claimants. As the plaintiffs showed valid locations of their mining claims, the law raised the presumption that they did the annual labor upon the claims. This presumption continued until the defendant made a prima facie showing that the annual labor was not done. Until such showing was made, and it never was made in this case, the plaintiffs were not required to say anything about annual labor and therefore were never to be classified as "claimants."

The above interpretations are in keeping with the attitude of the courts toward forfeitures.

It was stated in 2 Lindley on Mines, 3 Ed., Sec. 645: "We have heretofore observed the reluctance with which the courts enforce this penalty. They have settled the doctrine that the forfeiture cannot be established except upon clear and convincing proof of the failure of the former owner to have work performed or improvements made to the amount required by law. * * * The courts do not incline to the enforcement of this class of penalties, which have always been deemed in law odious." Also Morrison's Mining Rights, 16th Ed. 632.

IX. Effect of repeal of Waskey Act on burden of proof.

■■■ Even if the Waskey Act made prima facie evidence out of the fact that an affidavit of annual labor was not recorded, its repeal by the Act of 1938 freed cases, arising before but commenced after, the repeal, of such prima facie provision. 59 C.J. 1173.

"Remedial statutes, such as this, which affect only the procedure and practice of the courts in the enforcement of a right, and which do not impair the right itself, or wholly destroy a pre-existing remedy, are retroactive in the sense that they must be applied to causes of action existing at the time of their passage in all cases where the suit is subsequently commenced". Southern Indiana Ry. Co. v. Peyton, 1901, 157 Ind. 690, 61 N.E. 722, 723.

This rule has been applied in cases involving the shifting of the burden of proving or disproving contributory negligence.

Smith v. Freedman, 1929, 268 Mass. 38, 167 N.E. 335; Sackheim v. Pigueron, 1915, 215 N.Y. 62, 109 N.E. 109; Southern Indiana Ry. Co. v. Peyton, supra.

The New York Court of Appeals, holding that a statute permitted suit upon a money judgment, even though no such suit was possible at the time the judgment was entered, stated: "It is the settled law that statutes relating to procedure are retroactive and prospective in their application without affirmative provisions to that effect." Peace v. Wilson, 1906, 186 N.Y. 403, 79 N.E. 329, 330. The same rule has been applied by many courts: Bear Lake Irrigation Co. v. Garland, 164 U.S. 1, 17 S.Ct. 7, 41 L.Ed. 327; South Carolina v. Gaillard, 101 U.S. 433, 25 L.Ed. 937; Virginia & W. Va. Coal Co. v. Charles, D.C. W.D. Va., 1917, 251 F. 83, 127, 128; Carson v. Miami Coal Co., 1923, 194 Ind. 49, 141 N.E. 810; Woodvine v. Dean, 1907, 194 Mass. 40, 79 N.E. 882; Stocker v. Foster, 1901, 178 Mass. 591, 60 N.E. 407; First Methodist Episcopal Church v. Fadden, 1898, 8 N.D. 162, 77 N.W. 615; Ensley v. State, 1910, 4 Okl.Cr. 49, 109 P. 250; Baxter v. Hamilton, 1897, 20 Mont. 327, 51 P. 265.

█ Consequently, the burden of proof was upon the defendant to show that annual labor was not done either before or after the repeal of the Waskey Act.

X. Suspension of annual labor by acts of Congress.

█ a. The so-called "suspension notices", filed under the various moratorium statutes of Congress and dispensing with the performance of annual labor in certain years are the equivalent of the performance of annual labor. Field v. Tanner, 1904, 32 Colo. 278, 75 P. 916; Judson v. Herrington, 1942, 55 Cal.App.2d 476, 130 P.2d 802.

"Evidently, it was the intention of congress, in passing the special acts of 1893 and 1894, suspending the requirements of section 2324 of the Revised Statutes as to the annual labor on mining claims, that the recording of the prescribed notice should have the same legal effect as performing the labor". Nesbitt v. DeLamar's Nevada Gold-Min. Co., 1898, 24 Nev. 273, 52 P. 609, 610, 53 P. 178, 77 Am.St.Rep. 807.

█ Thus the filing of a notice of intention under the moratorium statutes would amount to a resumption of labor. Pine Grove Nevada Gold Mining Co. v. Freeman, Nev., 1946, 171 P.2d 366.

█ One cotenant has always had the right to perform the annual labor upon a claim as a unit, where other cotenants fail or refuse to perform the same or join with a cotenant in doing so. Saunders v. Mackey, 1885, 5 Mont. 523, 6 P. 361; Kline v. Wright, D.C. 1931, 51 F.2d 564.

█ It is presumed that Congress had in mind all such matters, and that if it had intended to withhold the benefits of the suspension act from tenants in common where their cotenants were fortunate enough to have to pay a Federal Income Tax, it would have clearly stated the same. As it did not so state, no such inference can be drawn.

b. By Joint Resolution approved October 5, 1917, 40 Stat. 343, Congress stated: "That in order that labor may be most effectively used in raising and producing those things needed in the prosecution of the present war with Germany, * * *", annual labor was abolished during 1917 and 1918, provided every claimant of a mining claim, in order to obtain the benefits of the resolution, should file or cause to be filed in the office where the location certificate was recorded, a notice of desire to hold the mining claim under the resolution.

The owner of a claim did not need to be exempt from the payment of income tax in order to claim the suspension.

By Joint Resolution approved February 28, 1919, 40 Stat. 1213, the first mentioned Joint Resolution was made applicable to Alaska, and annual labor suspended for 1917, 1918 and 1919.

W. E. Sullivan, as an owner of the "L Association" and "Snow Shoe Fraction", duly filed a notice of his desire to hold those claims under the terms of said Joint Resolutions.

█ It is believed that the desire was sufficient and abolished the requirement for doing annual labor for 1919.

c. For the annual labor year commencing at noon, July 1, 1933, the Act of Congress approved May 15, 1934, 48 Stat. 777,

provided that the provisions of Section 2324, R.S.U.S.; as to annual labor upon unpatented mining claims in the United States and Alaska, should be suspended. It then made further provisions as follows:

(1) That the suspension should not apply where the owner of a claim was subject to the payment of Federal Income Taxes for the taxable year 1933.

(2) That the suspension should not apply unless the owner filed before noon, July 1, 1934, a notice of his desire to hold the claim without performing annual labor, and further stating that he was not subject to the payment of Federal Income Taxes for the taxable year 1933.

(3) That the suspension should not apply to more than six placer mining claims, not to exceed 120 acres, held by the same person, nor to more than 12 placer mining claims, not to exceed 240 acres, held by the same partnership, association or corporation.

■ Inasmuch as the mining laws of the United States have always permitted the ownership and location of mining claims by a number of individuals as tenants in common of undivided interests, it would appear that Congress intended the suspension law to apply to these tenants in common, as well as to other owners, and that when it limited the number of claims held by an individual, a partnership, corporation or association upon which annual labor could be suspended, it meant to include all types of ownership, and to group tenants in common of a claim as an association.

The first part of the Congressional Act suspends the requirements of annual labor, and the second part excludes certain individuals and claims from the operation of the first part. Unless a person or claim clearly falls under the second part of said act, he or it is entitled to the exemption. The Act, 48 Stat. 777, provides: "That such suspension of assessment work shall not apply to more than six lode-mining claims not to exceed one hundred twenty acres (in all) held by the same person, nor to more than twelve placer mining claims not to exceed two hundred forty acres (in all) held by the same association or corporation."

■ It is clear that the word "same", used in said Act, applies with equal force to partnership, corporation or association. A partnership or association is not the same as another partnership or association if there is a difference in the membership of the same. To argue that several different partnerships were the same because a member or members of one was likewise one of the members of another, would receive scant attention. There is no reason for giving any more attention to the argument that one association is the same as another if there is a common member among the many of each association.

■ d. By Instrument Number 72970, filed for record in the Office of the Recorder at Fairbanks, Alaska, June 30, 1934, the then owners of the "L Association" (a claim of 160 acres), J. P. Hogan, E. A. Mitchell, John McCandlish, W. E. Sullivan, L. C. Hess, stating that they were exempt from the payment of Federal Income Taxes for the taxable year of 1933, filed a desire to hold said association claim without doing the annual labor for that year.

L. C. Hess, alone, filed a similar desire in the Recorder's Office at Livengood, Alaska, upon the 26th day of June, 1934. He stated he was the owner of "claims as follows: three-eighths ($\frac{3}{8}$ths) of Baltic Claim, * * * three-eighths ($\frac{3}{8}$ths) of Hidden Treasure, * * * five-twenty-fourths ($\frac{5}{24}$ths) of Gold Dollar Claim, * * * one-third ($\frac{1}{3}$rd) of Basin Association, * * * one-sixth ($\frac{1}{6}$th) of Marietta Association, * * * one-half ($\frac{1}{2}$) of Thor Association, * * * said interests above-mentioned contain in the aggregate, approximately 70 acres of placer mining ground." There is no statement that there are other co-owners, and no statement that these are divided claims.

If they are divided claims and Mr. Hess is the owner of each of those claims, individually, it is not believed that this interferes with his being a member of the association of persons owning the "L Association". If the claims described by Mr. Hess are owned by various tenants in common and he is merely the owner of an undivided interest, there is still no reason for this desire interfering with Mr. Hess being a

 

member of the association of persons owning the "L Association", as the burden of proving that those owning the "L Association" are the same individuals as those owning the Livengood property is upon the defendant and no such showing has been made.

e. Luther C. Hess and J. Cosgrove, upon June 30, 1934, filed a notice of their desire to hold the Gold Coin Group, an association placer claim, without doing annual labor. It was filed in the Fairbanks Recording District upon June 30, 1934, as Instrument Number 72971.

As the instrument shows, it was filed later than the desire for the "L Association", which was Instrument No. 72970. This instrument would in no way affect the "L Association" desire, Instrument No. 72970. However, as stated above, the association of Luther C. Hess and J. Cosgrove, who filed a desire as to the claim owned, does not affect the rights of the association of men owning the "L Association".

f. John McCandlish was one of the signers of a desire to hold the "L Association" and also, with other individuals, to hold four single placer mining claims on Mike Hess Creek, and with two other individuals of two association claims on Mike Hess Creek. It is believed that each association of men is separate and entitled to the exemptions of the claims mentioned in their desire.

g. On March 31, 1916, W. E. Sullivan filed an affidavit of annual labor for the annual labor year of 1915 for the "Snow Shoe Fraction". It stated that 14 days labor were performed, sinking a hole 18 feet deep, 6 feet by 4 feet, and timbering for 8 feet, "also delivered 40 cabin logs on claim, 150 feet from the side and on upper end, of the value of $100 * * * and that $100 was actually paid for such work and improvements by the owners."

Evidence was produced to the effect that the cabin logs mentioned in said affidavit were never used upon said claim, but were burned so as to destroy their value for building, within a couple of years after 1915.

W. E. Sullivan testified that he paid more than $100 for said work and improvements, but did not remember how much more.

Inasmuch as the burden is upon the defendant to clearly show a failure to perform the annual labor, and inasmuch as under the affidavit and the statement of Mr. Sullivan, it is possible that he paid $100 for the work done, and that the amount he paid in excess of $100 was for hauling the logs, it does not appear that the defendant has clearly proven by a preponderance of the evidence that the assessment work was not done upon said claim for the year 1915.

XI. There was no evidence produced in this case as to the citizenship of the defendant. Emma Grace Lowe.

XII. The findings of fact set forth by the advisory jury in their verdict herein are confirmed as correct and adopted as the findings of the court.

Findings of fact and conclusions of law may be drawn pursuant to the above opinion.